W. R. Grace & Co. *vs.* Commissioner of Revenue.

Suffolk. April 4, 1979. — July 31, 1979.

Present: Hennessey, C.J., Quirico, Kaplan, Liacos, & Abrams, JJ.

*Taxation*, Corporate excise. *Constitutional Law*, Taxation, Interstate commerce. *Due Process of Law*, Taxation.

Evidence in a proceeding before the Appellate Tax Board warranted the conclusion that a corporate taxpayer acquired and maintained its ownership interest in another corporation not merely as an investment but as an integral component in its total operation, and, therefore, the income from the sale of that interest was "derived from business" within the meaning of G. L. c. 63, § 38. [581-584]

Evidence in a proceeding before the Appellate Tax Board warranted the conclusion that a corporate taxpayer's ownership interest in another corporation was unitary with its business carried on in Massachusetts, and, therefore, the income from the sale of that interest was "derived from business carried on within the commonwealth" within the meaning of G. L. c. 63, § 38. [584-587]

Apportionment under G. L. c. 63, § 38, of income derived from a corporate taxpayer's sale of its ownership interest in another corporation did not violate the due process clause of the Fourteenth Amendment to the United States Constitution where the ownership interest was a component of the taxpayer's unitary enterprise and the actual tax assessed by Massachusetts was reasonable. [587-588]

Apportionment under G. L. c. 63, § 38, of income derived from a corporate taxpayer's sale of its ownership interest in another corporation did not violate the commerce clause of the United States Constitution. [588-589]

Apportionment under G. L. c. 63, § 38, of income derived from a corporate taxpayer's sale of its ownership interest in another corporation did not violate any provision of the Massachusetts Constitution. [589-590]

The Commissioner of Corporations and Taxation did not abuse his discretion in rejecting a taxpayer's application pursuant to G. L. c. 63, § 42, to make an alternative allocation of income where the taxpayer did not show by clear and cogent evidence that the income attributed to the Commonwealth was in fact out of all appropriate

proportion to the business transacted in the Commonwealth or had led to a grossly distorted result. [590-591]

APPEAL from a decision of the Appellate Tax Board.

*Chester M. Howe & Paul H. Frankel,* of New York (*Maxwell D. Solet* with them) for the plaintiff.

*Maureen Dewan,* Assistant Attorney General (*Mitchell J. Sikora, Jr.,* Assistant Attorney General, with her) for the defendant.

LIACOS, J. W. R. Grace & Co. (Grace, or the company), a Connecticut corporation doing business in Massachusetts, sold its stock interests in the Miller Brewing Company and several other companies in 1969, realizing a significant net gain.[1] This appeal from a decision of the Appellate Tax Board (board) presents the question whether the Commissioner of Corporations and Taxation of the State Tax Commission (Commissioner)[2] properly included that gain as income subject to apportionment under the Massachusetts corporation excise, G. L. c. 63, § 38.

General Laws c. 63, § 39, requires that every foreign corporation doing business in the Commonwealth pay an annual excise which is the sum of a percentage of the value of its taxable tangible property or its net worth, plus 8.33% of its taxable net income. Taxable net income, for corporations doing business both within and without Massachusetts, is denoted in G. L. c. 63, § 38, as the amount "derived from business carried on within the commonwealth." This figure is ascertained by applying to the corporation's net income, determined according to

---

[1] According to the parties' stipulation of facts, these divestments generated a net 1969 gain aggregating $73,935,737. The Miller sale resulted in a $92,982,637 gain; the other transactions generated a net loss. For simplicity, and consistently with the characterization by the parties as set forth in the stipulation of facts, we refer to the net 1969 stock sale gain as the "Miller gain."

[2] Pursuant to St. 1978, c. 514, § 278, the Commissioner of Revenue has been substituted for the Commissioner of Corporations and Taxation.

the Federal Internal Revenue Code (with certain Massachusetts statutory adjustments), a three-factor formula based on a ratio of the local corporate property, payroll, and sales to such factors everywhere.[3] Finally, G. L. c. 63, § 42, as amended through St. 1969, c. 599, § 1, provides in pertinent part that, "[i]f the allocation and apportionment provisions of this chapter are not reasonably adapted to approximate the net income derived from business carried on within this commonwealth, a corporation may apply to the commissioner to have its income derived from business carried on within this commonwealth determined by a method other than that set forth in section thirty-eight."

Grace is a corporation which operates in several foreign countries and is qualified to do business in all States and in the District of Columbia. Its multistate business activities, which are conducted partly within and partly without Massachusetts, relate primarily to chemicals and consumer products. In 1969, Grace maintained fourteen business facilities in ten Massachusetts municipalities, all of which operations related to its chemical business. During 1969, Grace's involvement in the Commonwealth included a payroll of $13,907,897 for 1407 employees, real and personal property valued at $12,477,171, and sales of $16,044,571. The payroll represented 6.76%, the property 2.72%, and the sales 1.78%, respectively, of Grace's total payrolls, property, and sales.

In September, 1966, Grace acquired a 52.754% interest in the Miller Brewing Company. As noted above, it sold its share in 1969 for a substantial gain, more than offsetting losses incurred as a result of its divestment of several other corporate stock holdings. Having been granted an extension of time to file its 1969 corporation excise re-

---

[3] Statute 1975, c. 684, § 49, amended G. L. c. 63, § 38(c), and altered the apportionment formula by weighting the sales factor more heavily than the other two factors in the determination of net income "derived from business carried on within the commonwealth."

turn, Grace filed in November, 1970, a return for 1969 which showed an aggregated Massachusetts income of $897,386, including an apportionate share of the Miller gain. Simultaneously, it submitted an application to the Commissioner, pursuant to G. L. c. 63, § 42, to make an alternative allocation of income to the Commonwealth which excluded the Miller gain.[4] This alternative allocation reported a 1969 "total excise due" of $58,684, which Grace satisfied. The Department of Corporations and Taxation rejected the application, and in June, 1971, assessed Grace an additional $75,858.68 in corporate excise for 1969, attributable to the inclusion of the Miller gain.

Grace filed an application for abatement of the additional tax with the State Tax Commission. Pursuant to G. L. c. 58A, § 6, Grace initially consented to the Commissioner's failure to act on the application within six months of the filing date, but in December, 1975, it withdrew its consent,[5] effectuating the constructive denial of

---

[4] In pertinent part, the application stated: "For 1969, the taxpayer's Federal Net Income includes extraordinary long-term capital gains and losses from the sales of various stock investments with a net gain thereon of $73,935,737. The detail is shown on the attached schedule.

"This net gain is treated as extraordinary income and excluded from income from operations in certified financial statements. It accounts for approximately 87.5% of the taxpayer's total 'net income' as defined in section thirty, Chapter 63, of the General Laws.

"It is respectfully submitted that this net capital gain income from the sale of investments is wholly unrelated to the taxpayer's business activities within the Commonwealth of Massachusetts and that the allocation and apportionment provisions of Section thirty-eight, Chapter 63, of the General Laws, as amended, are not reasonably adapted to approximate the taxpayer's net income from business carried on within the Commonwealth. The taxpayer, therefore, requests that such net income be determined by a method other than that set forth in section thirty-eight in the respect that the aforementioned net capital gain be totally excluded in the determination of taxable net income subject to apportionment."

[5] Grace filed 1972 and 1973 corporation excise returns disclosing substantial overpayments. Although Grace requested refunds of these overpayments, the Commissioner retained amounts sufficient to satisfy the alleged 1969 deficiency.

the application. In January, 1976, Grace appealed the denial to the board, and in December, 1978, the board affirmed that denial. Grace appealed to this court under G. L. c. 58A, § 13. The record before us includes a stipulation of facts, documentary exhibits, certain testimony, and the extensive findings of fact, report, and opinion of the board. We affirm.

Grace challenges the inclusion of the Miller gain in the apportionment formula as impermissible under the language of G. L. c. 63, §§ 38, 42, and under the United States and Massachusetts Constitutions. We address these contentions serially.

1. Is the Miller gain includible as an element of net income "derived from business carried on within the commonwealth," within the meaning of G. L. c. 63, § 38? Grace argues that the Miller gain must be excluded because (a) it is not income "derived from *business*" and (b) even if it is income "derived from *business*" within the purview of the statute, it is not income "derived from *business carried on within the commonwealth*" (emphasis supplied). The board rejected both components of Grace's argument. The Commissioner now argues that our review of the board's determinations with respect to these issues is at best "limited to the legal question whether they are supported by substantial evidence." While this may be true as to factual determinations, we do not view the board's ultimate conclusions as to both parts (a) and (b) of Grace's argument as merely findings of fact, see G. L. c. 58A, § 13; *New Bedford Gas & Edison Light Co.* v. *Assessors of Dartmouth*, 368 Mass. 745, 749 (1975), but as determinations combining both findings of fact and conclusions of law. We therefore consider the board's implicit conclusions of law within the full scope of review appropriate thereto. Cf. *American Smelting & Ref. Co.* v. *Idaho State Tax Comm'n*, 99 Idaho 924, 933 (1979) (hereafter *ASARCO*).

(a) *Income "derived from business."* Grace contends that the Miller holdings must be characterized as a "pas-

sive investment" and, consequently, that the gain realized therefrom constituted "non-business" income not subject to apportionment under § 38. In support of this position, it claims that the Miller holdings were described to the Grace board of directors at the time of acquisition, and to the New York Stock Exchange in the listing application, as an "investment." Grace further argues that the relationship between Grace and Miller was "arm's length," and that, according to testimony presented to the board, ownership by Grace of the Miller stock was irrelevant to the increase in Miller stock value. In conclusion, Grace maintains that although it held investment assets of substantial value, including the Miller stock, it was not in the "business" of buying and selling securities, and the Miller gain, therefore, cannot be included as income "derived from business."

We are not persuaded. Contrary to Grace's contentions, the board characterized the purchase of a majority stock interest in Miller as "the acquisition of an operating subsidiary." We agree with that description. While Grace was technically not in the business of buying and selling securities, the record is replete with evidence that its business included the purchase and sale of operating subsidiaries.[6] The Miller acquisition was no exception. In its listing application to the New York Stock Exchange, Grace stated: "The Company wishes to acquire the Miller

---

[6] According to its 1969 Annual Report to stockholders, Grace's operations in chemicals, minerals, consumer products, and specialties required eleven groups and thirty-six subordinate divisions for their management. President J. Peter Grace noted that in 1969 the company had sold its shipping line and several Latin American businesses, and that it intended to continue such divestments so as to generate "funds for other operations with considerably more growth potential" and to "shrink the Company's dependence on these unstable businesses." Concurrently, in September, 1969, Grace formed its New Enterprises Group as "a vehicle for launching new ventures that do not fit the Company's existing operating groups." Generally, as its treasurer testified, Grace's "basic intention when it buys a company is to integrate it into the operations of its other businesses."

capital stock in order to expand the Company's oper-
ations." These intentions were echoed by Grace's counsel[7]
and by its treasurer. Full ownership, active management,
and national expansion of Miller were anticipated. Owing
to the minority shareholder's disinclination to sell his
interest, however, none of these expectations were real-
ized.

Grace's inability to acquire full control and its failure
to exercise active management of the fuller holding do
not strip that holding of its "business" character. The
focus of the inquiry should be on the purpose and use of
the stock by Grace prior to its disposition. See *ASARCO,
supra* at 937. Cf. *Johns-Manville Prods. Corp.* v. *Commis-
sioner of Revenue Administration*, 115 N.H. 428 (1975),
appeal dismissed, 423 U.S. 1069 (1976); *Corn Prods. Ref.
Co.* v. *Commissioner*, 350 U.S. 46, 50-52 (1955). Grace ac-
quired Miller in order to operate it. During the two and
one-half years of majority ownership, Grace regarded
Miller as a member of its Consumer Products Group,
which was engaged in the operation and development of
consumer business in the United States, Europe, and the
Far East.[8] In its 1969 Annual Report's "Financial Re-

---

[7] Counsel for Grace stated in his opening argument before the board:
"It was Grace's hope that 100 percent ownership could be achieved
within two years; that Miller could then become part of Grace's af-
filiated group and that Grace could thus gain entry into the beer
industry. . . . The hope that Grace would obtain 100 percent ownership
of Miller was shattered when Miller's minority shareholder refused to
sell. After the two-year period elapsed, Grace concluded that it would
never be able to obtain that control, and in June, 1969, Grace sold its
Miller Brewing shares to Philip Morris."

[8] The group executive of the Consumer Products Group stated, in
response to the question, "What impact did the sale of your interest
in Miller Brewing Company have on your group last year?":

"Grace realized a pre-tax profit of $81 million on the sale, and it was
undoubtedly an excellent move from a corporate point of view. But it
has caused us to do a lot of regrouping of our activities to close some
of the gap that occurred as Miller moved out. Because of the sale, we
ended the year with a group that had a profit-producing capability
considerably less than it had at the beginning of the year" (excerpt
from Grace's 1969 Annual Report).

view," Grace cited Miller's $70,000,000 contribution to its consolidated sales. These factors point to the conclusion that Grace acquired and maintained its ownership interest in Miller as an integral component in its total operation, and that the income from the sale of that interest was "derived from business" within the meaning of G. L. c. 63, § 38. See *ASARCO, supra; Montgomery Ward & Co.* v. *Commissioner of Taxation,* 276 Minn. 479, 483-484 (1967); *Cleveland-Cliffs Iron Co.* v. *Michigan Corp. & Sec. Comm'n,* 351 Mich. 652 (1958).

(b) *Income "derived from business carried on within the commonwealth."* During 1969, Grace's operations in Massachusetts were exclusively related to its chemical business. Miller Brewing Company, with its principal base of operations in Milwaukee, Wisconsin, had no base of activities in Massachusetts. Grace's decision to purchase the Miller stock was made by the executives of the company in New York city. Grace points to each of these factors as support for its contention that the income from the Miller gain was not "derived from business carried on within the commonwealth," and is therefore not properly subject to apportionment by Massachusetts.

We cannot agree. "The fact that a tax is contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction." *Wisconsin* v. *J.C. Penney Co.,* 311 U.S. 435, 445 (1940). The United States Supreme Court has further acknowledged that "a State in attempting to place upon a business extending into several States 'its fair share of the burden of taxation' is 'faced with the impossibility of allocating specifically the profits earned by the processes conducted within its borders.' " *Butler Bros.* v. *McColgan,* 315 U.S. 501, 507 (1942), quoting from *Underwood Typewriter Co.* v. *Chamberlain,* 254 U.S. 113, 121 (1920). In an attempt equitably to tax multistate and multinational businesses engaged in activity in Massachusetts, the Legislature has chosen the "commonly adopted formula measuring the tax-

payer's values in the Commonwealth in relation to its values worldwide," *Dow Chem. Co.* v. *Commissioner of Revenue, ante* 254, 259 (1979), which is embodied in G. L. c. 63, § 38. See Uniform Division of Income for Tax Purposes Act, § 9-13, 7A U.L.A., 91, 100-103 (1978). As we noted further in *Dow Chem. Co., supra* at 259 n.4, quoting from *F. W. Woolworth Co.* v. *Director of Div. of Taxation,* 45 N.J. 466, 481 (1965): "The rationale for the requirement that corporate taxpayers shall include the full amount of their taxable net income in their State return, and then allocate a suitable portion to the State, is that 'the realistic value of the exercise of a franchise in a particular state is enhanced and contributed to by the worth or income of the entire enterprise elsewhere.' "

While the phrase "income derived from business carried on within the commonwealth" does not require the actual physical presence in Massachusetts of a particular taxable transaction, we recognize that some minimal connection between the business carried on in this Commonwealth, and that transaction, must exist. That connection has generally been found when the activity sought to be taxed is a component of an enterprise which is deemed "unitary" with the business carried on in the taxing State. Several formulations of the test for "unitariness" have been propounded. See, e.g., *Butler Bros* v. *McColgan,* 315 U.S. at 508; Fla. Admin. Code Rule 12C-1.15(4), which implements 1971 Fla. Stats. § 214.71 (Supp. 1979); Rudolph, State Taxation of Interstate Business: The Unitary Business Concept and Affiliated Corporate Groups, 25 Tax L. Rev. 171 (1970); W. Lavelle, What Constitutes a Unitary Business, 25 U.S. Cal. Law Center Twenty-fifth Tax Inst. 239 (1973). Essentially, the theory underlying apportionment statutes such as G. L. c. 63, § 38, suggests: "'[W]hether a number of business operations having common ownership constitute a single or unitary business or several separate businesses for tax purposes depends upon whether they are of mutual benefit to one another and on whether each operation is dependent on or con-

tributory to others.' *Great Lakes Pipe Line Co.* v. *Commissioner of Taxation*, 272 Minn. 403, 408 [(1965), appeal dismissed, 384 U.S. 718 (1966)]." *ASARCO, supra* at 931.[9]

Grace acknowledges that all its operating businesses in the United States, including its Massachusetts activities, are unitary for the purposes of State taxation, and the board so found. Grace maintains, however, that as a "separate investment" the Miller holding ought to be segregated from its unitary involvements and the gain therefrom excluded from apportionment. In order to prevail in this contention, Grace bears the burden of showing by clear and cogent evidence that the inclusion of the Miller gain in the § 38 formula resulted in extraterritorial values being taxed. See *Commonwealth* v. *Emhart Corp.*, 443 Pa. 397, 403, cert. denied, 404 U.S. 981 (1971); *Johns-Manville Prods. Corp.* v. *Commissioner of Revenue Administration*, 115 N.H. 428 (1975). It has failed to meet that burden. The record and the findings of the board indicate the Miller holding was acquired by Grace in order to bolster and expand its unitary operations. Miller represented an asset on Grace's consolidated balance sheet, and, as noted earlier, was viewed as an integral component of the Consumer Products Division "contribut[ing] $70,000,000 to consolidated sales" of Grace in 1968. Further, Grace applied the $92,982,637 in proceeds from the sale of the Miller stock to repay short-term loans of the company at large.

Grace argues that it sustained an "arm's length" relationship with Miller and in no manner contributed either

---

[9] As one commentator has recently remarked: "In general, a corporation may be considered to be engaged in a unitary business with affiliated corporations if the operation of its business is dependent upon or contributory to the operation of the business of the affiliated corporations. Two or more corporations may be considered to be affiliated if there is common ownership or control between them. Direct or indirect ownership or control of more than 50% of the voting stock of a corporation may constitute such ownership or control." Corrigan, Interstate Corporate Income Taxation: Recent Revolutions and a Modern Response, 29 Vand. L. Rev. 423, 439 n.38 (1976).

to its operations or to the appreciation in value of its stock. Close functional integration of each arm of a business organism is not an essential element of unitariness. The record shows Grace owned a majority share of Miller. Its president sat on Miller's board of directors. The investment world had notice of Grace's position with respect to Miller, and of the potentiality for, if not actual exercise of, its assumption of operational control. Grace apparently chose to refrain from active management in anticipation of its complete ownership of the Miller business. That political decision, however, did not serve to nullify the essentially unitary character of Grace's relationship with its Miller holding.[10] See *ASARCO, supra* at 935. See also *Montgomery Ward & Co.* v. *Commissioner of Taxation,* 276 Minn. 479 (1967); *Johns-Manville Prods. Corp.* v. *Commissioner of Revenue Administration, supra.* But cf. *Stan Musial & Biggie's, Inc.* v. *State Dep't of Revenue,* 363 So. 2d 375 (Fla. Dist. Ct. App. 1978); *Commonwealth* v. *ACF Indus., Inc.,* 441 Pa. 129 (1970). We hold, therefore, that the Miller gain was properly included as income "derived from business carried on within the commonwealth" within the meaning of G. L. c. 63, § 38.

2. Is the taxation of Grace's Miller gain prohibited by the United States Constitution? Grace does not attack the constitutionality of formulary apportionment in the abstract. Rather, it argues that the application of the § 38 formula to the Miller gain produced a result violative of the due process and commerce clauses. We cannot agree, for the following reasons.

(a) *Due process.* The United States Supreme Court has recently recapitulated the limitations imposed by the due process clause on the States' power to tax the income of interstate business: "The Due Process Clause places two

---

[10] Significantly, the board found that "*all* of Grace's business activities are integrated and subject to central supervision, control and management from the corporate offices in New York" (emphasis supplied).

restrictions on a State's power to tax income generated by the activities of an interstate business. First, no tax may be imposed unless there is some minimal connection between those activities and the taxing State. . . . Second, the income attributed to the State for tax purposes must be rationally related to 'values connected with the taxing State' " (citations omitted). *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 273 (1978). Grace concedes that the "nexus" required by the first prong of the *Moorman* test is present here. It argues, however, that the Miller gain does not bear a rational relationship to "values connected with the taxing state." Our conclusion that the Miller holding is appropriately considered a component of Grace's unitary enterprise puts this argument to rest. See our discussion in part 1(b) *supra* of this opinion. As one element of Grace's unitary income among many, the Miller gain was properly subject to apportionment under § 38. Further, the actual tax assessed by Massachusetts was reasonable. Compare *Wisconsin* v. *J.C. Penney Co.*, 311 U.S. 435 (1940), with *Hans Rees' Sons* v. *North Carolina ex rel. Maxwell*, 283 U.S. 123 (1931). The board found that "the Massachusetts tax of approximately $77,000 is but approximately 1/10th of 1 percent of the amount reported by Grace as its Federal capital gain and an even less percentage of Grace's net income as so reported." In this light, Grace has failed to prove "by clear and cogent evidence" that the income attributed to the Commonwealth "is in fact 'out of all appropriate proportion to the business transacted . . . in that State,' . . . or has 'led to a grossly distorted result, . . .' " (citations omitted). *Moorman, supra* at 274.

(b) *Commerce clause.* Grace's argument that the Commonwealth's taxation of the Miller gain contravenes the commerce clause is similarly unpersuasive.[11]

---

[11] In responding to claims of commerce clause violations, the Supreme Court has used language not unlike that employed with reference to challenges founded on the due process clause: "[T]his Court has

Fundamentally, it contends that since New York, as the State of commercial domicil and the situs of the Miller transactions, has the "power" to tax the entire Miller gain,[12] the taxation of a portion of that gain by Massachusetts exposes Grace to the danger of multiple taxation in violation of the commerce clause. Grace fails to recognize, however, that "speculative concerns with multiple taxation" provide insufficient basis for invalidating a tax derived from a reasonable apportionment formula reasonably applied. See *Moorman, supra* at 280. See also *ASARCO, supra* at 940. Cf. *George S. Carrington Co.* v. *State Tax Comm'n,* 375 Mass. 549, 553 (1978). Grace has presented no evidence in the record which indicates that New York has in fact taxed the Miller gain, notwithstanding the passing of almost ten years since the holding was sold. Even if it had produced such evidence, in a conflict between this Commonwealth's apportioned tax on the Miller gain and an attempt by New York to tax the same income without apportionment, it is likely that New York's assessment would be the one requiring modification. See note 11, *supra.* As a result, Grace's commerce clause challenge must fail.

3. Does the taxation of the Miller gain contravene the Massachusetts Constitution? Grace seeks refuge from the apportionment of the Miller gain in art. 10 of the Declara-

---

long realized the practical impossibility of a state's achieving a perfect apportionment of expansive, complex business activities such as those of appellant, and has declared that 'rough approximation rather than precision' is sufficient." *International Harvester Co.* v. *Evatt,* 329 U.S. 416, 422 (1947).

[12] The validity of this assumption, in any event, is subject to considerable doubt. "A number of recent decisions of the United States Supreme Court imply that the issue would be decided by requiring that taxation of investment income of corporations engaged in interstate commerce be on an apportioned basis, rather than by permitting the commercial domicile to tax such income to the exclusion of all other jurisdictions." *Mobil Oil Corp.* v. *Commissioner of Taxes,* 136 Vt. 549 (1978), prob. juris. noted, 441 U.S. 941 (1979). See *Johns-Manville Prods. Corp.* v. *Commissioner of Revenue Administration,* 115 N.H. 428, 430-431 (1975), appeal dismissed, 423 U.S. 1069 (1976).

tion of Rights, and Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution.[13] Grace's citation of these articles adds nothing, however, to its argument premised on the United States Constitution. While we have recognized in certain circumstances that a given provision of the Massachusetts Constitution may afford greater protection to individuals than its Federal counterpart, see, e.g., *Commonwealth* v. *Soares*, 377 Mass. 461 (1979), that principle is inapplicable here. Grace apparently concedes that "[t]his Court has held that Article X is to be given the same interpretation as the Due Process Clause of the United States Constitution." See *School Comm. of Hatfield* v. *Board of Educ.*, 372 Mass. 513, 515 n.2 (1977). We have already treated the company's Federal due process challenge. Further, in addressing its claim under art. 4, we need only reiterate our view that the apportioned taxation of the Miller gain is reasonable. *Frost* v. *Commissioner of Corps. & Taxation*, 363 Mass. 235, 253, appeal dismissed, 414 U.S. 803 (1973). It does not, as Grace suggests, amount to discrimination in the form of an unequal excise, founded on an immaterial fact; rather, it is a valid means of assessing Massachusetts' fair share of Grace's net unitary income.

Finally, Grace submits that even if the claims discussed above are rejected, and the court permits the inclusion of the Miller gain, that gain should be apportioned "by a modified formula which better reflects the factors which contributed to the gain." We have recently recognized

---

[13] The pertinent portion of art. 10 of the Massachusetts Declaration of Rights provides: "Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws. He is obliged, consequently, to contribute his share to the expense of this protection . . .: but no part of the property of any individual, can, with justice, be taken from him, or applied to public uses, without his own consent, or that of the representative body of the people."

The relevant segment of Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution states that the General Court has the power and authority to "impose and levy, reasonable duties and excises."

that if in a particular case the § 38 apportionment pro-
visions "are not reasonably adapted to approximate the
net income derived from business carried on within the
Commonwealth, the taxpayer may proceed under G. L.
c. 63, § 42, to attempt to use another method shown to be
more reasonable." *Dow Chem. Co.* v. *Commissioner of
Revenue, ante* 254, 260 (1979). Grace made such an at-
tempt in 1970, and it was rejected by the Commissioner.
We cannot say that he abused his discretion. Before we
will require the Commissioner to adopt an alternative
computation method, the taxpayer must prove by "clear
and cogent evidence" that the income attributed to the
Commonwealth is in fact "out of all appropriate propor-
tion to the business transacted" here or has "led to a
grossly distorted result." See *Moorman, supra* at 274. As
we have stated already, that burden has not been met
here. Cf. *ASARCO, supra* at 939; *F. W. Woolworth Co.* v.
*Commissioner of Taxes,* 133 Vt. 93 (1974). But cf. *F. W.
Woolworth Co.* v. *Director of the Div. of Taxation,* 45 N.J.
466, 494-501 (1965).

Accordingly, the decision of the Appellate Tax Board is
affirmed.

*So ordered.*