# IN THE OREGON TAX COURT

## GILMORE STEEL CORPORATION
### *v.*
## DEPARTMENT OF REVENUE
### (TC 1447)

Robert C. Alexander, Esq., San Francisco, California, and Ms. Amy L. Houchen and Jack B. Schwartz of Newcomb, Sabin, Meyer & Schwartz, Portland, represented plaintiff.

Walter J. Apley, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision part for plaintiff, part for defendant rendered September 16, 1982.

### CARLISLE B. ROBERTS, Judge.

Plaintiff appealed from the defendant's Order No. I 80-58, dated September 9, 1980, which denied plaintiff's requested adjustments or refunds of Oregon corporation excise taxes (ORS ch 317) for the tax years 1966 through 1975. The plaintiff, Gilmore Steel Corporation, is a Delaware corporation with its chief executive offices in San Francisco, California. During the years in question, the corporation was doing business in Oregon, manufacturing and selling steel in Oregon and elsewhere. The plaintiff timely filed Oregon corporation excise tax returns pursuant to ORS ch 317 for the years 1966 through 1975. The Department of Revenue issued notices of assessment for the tax years 1966, 1967, 1968, 1969, 1974 and 1975 and letters of refund denial for the years 1970, 1971 and 1972. The parties agree that four issues must be decided by the court:

1. Whether rents, interest and capital gains from the Gilmore Industrial Center, Vancouver, Washington, constituted "business income" from "a business unitary with the sale of steel" (Stip, at 2) for the tax years 1967 through 1971 and in 1973.

2. Whether interest income, derived from the proceeds of a sale by the plaintiff of shares of its common stock to Midland Ross Corporation constituted "business income" or "nonbusiness income" (apportionable or nonapportionable to Oregon during the tax years 1973 and 1974), pursuant to ORS 314.610(1) and (5) (sections of the Uniform Division of Income for Tax Purposes Act, cited herein as "UDITPA").

3. Whether gain from the sale of an option to purchase real property in Portland, Oregon, adjacent to plaintiff's steel mill, constituted business or nonbusiness income in the tax year 1972 (which also affects tax year 1973).

4. Whether the plaintiff was "taxable in Canada" (or Oregon) in 1975 on sales of steel manufactured in Oregon and sold by it, pursuant to ORS 314.620(2).

A subordinate issue, connected with the first issue described above, is whether the Department of Revenue is estopped from claiming that income from the Gilmore Industrial Center constitutes business income.

*The Gilmore Industrial Park.* In 1960, Gilmore Steel Corporation ("Gilmore" herein) successfully bid and purchased property adjacent to the Columbia River in Clark County, Washington, in or near the city of Vancouver, which had been known as the Vancouver Shipyard. It has been stipulated that Gilmore acquired the title to the property in order to dispose of all the surplus equipment and other personal property included in the invitation to bid and to assure itself of a possible location for expansion or relocation of its existing steel manufacturing facilities in the Portland area. The property was usable as a location to scrap surplus ships, the scrap steel being usable to supply the then existing steel plant in Portland.

The personal property was largely disposed of by 1964 and Gilmore began to lease space in the shipyard to outsiders. In late 1964 and 1965 it became evident that the company would not be able to build a steel mill on the shipyard property and that it would use land offered by the Port of Portland in the Rivergate area, within the city of Portland.

Following this change of plans, the company changed the name of the property to Gilmore Industrial Center and engaged in long-range plans for developing the property as an industrial center. Gilmore's policy was that the industrial center would be wholly self-supporting and that no funds from the steel operation would be used to enhance the investment. The center kept its own books and records and maintained its own bank accounts. These funds were not mingled with the

corporate accounts of the plaintiff. However, in 1967, profit from the operation of the center in the amount of $120,000 was transferred to the corporate accounts. The preponderance of the evidence leads the court to conclude that, beginning with the tax year 1966, the Gilmore Industrial Center and Gilmore's activities in the production and sale of steel were separated from each other and neither activity was supported by or contributed to the other. The parties have stipulated that:

> "Gilmore Steel sold the Industrial Center to its Pension Trust in 1968 for $3,885,000, payable $185,000 at the closing on Decemnber 30, 1968, $600,000 on or before January 31, 1969, and $3,100,000 through a promissory note bearing interest at 4 percent per annum and due on or before January 15, 1972. The Industrial Center was sold to the Pension Trust in order to generate cash and to fund the pension plan. Gilmore Steel was obligated to pay defined benefit pensions to retired employees, and a substantial income producing asset in the pension trust was beneficial in funding the obligation.
> * * *

> "* * * Because it was unable to generate cash to develop the Industrial Center, the Pension Trust later sold it to Bressie and Company, a real estate investment company." (Stip, at 6-7.)

The issue of whether the Industrial Center was investment property or business property was first raised in an audit of Gilmore by the defendant for the tax years 1964 and 1965. This issue was discussed at length in a letter to Gilmore, dated March 1, 1968, written by the present Chief Tax Counsel for the Oregon Department of Justice, representing the defendant (Ex B-2-A). In consequence of this letter, a settlement of the issue was made for the tax years 1964 and 1965, based upon treating the property as part of the unitary business of plaintiff "until January 1, 1966." The letter indicates that the Chief Tax Counsel entertained the possibility that the property was no longer to be regarded as a part of the steel manufacturing unit after that date because of the plans of the Gilmore Industrial Center and the abandonment of the area as a steel mill. However, the counsel reserved the right to review the applicablility of the unitary concept in a future year. "This can bear waiting until perhaps 1969 or 1970." (Ex B-2-A.)

■     The court finds insufficient support for an application of the doctrine of equitable estoppel, as argued by plaintiff, on the basis of this letter and the subsequent acts of the department in settling accounts for 1964 and 1965. It was only a "settlement" for those years and without a resolution of the issue for the future.

Although the rental income accruing during the plaintiff's operation of the industrial center is not deemed part of the unitary business by the court, further questions are raised by defendant because of the sale of the industrial center to the plaintiff's Pension Trust, requiring consideration as to the income tax status of the capital gain and the interest received on the interest-bearing promissory notes received by Gilmore from the Pension Trust.

■     Resolution of this question is to be found in a decision of the United States Supreme Court which was handed down after this suit was submitted to the Oregon Tax Court. In *ASARCO, Inc. v. Idaho State Tax Commission,* 458 US 307, 102 S Ct 3103, 73 LEd2d 787 (1982), the court held that dividends, interest income and capital gains of a *unitary business* are taxable by a nondomiciliary state, but that the term "unitary business" does not include activities which are "discrete" in relation to those activities carried on in the taxing state. *See Exxon Corp. v. Wisconsin Dept. of Revenue,* 447 US 107, 123-124, 100 S Ct 2109, 2120, 65 L Ed2d 66, 81 (1980). As stated above, this court has found that activities in Vancouver, Washington, of the Gilmore Industrial Center are insufficiently connected with the activities of steel making and the sale of steel in Oregon and thus separate and discrete from Gilmore's unitary business of the production and sale of steel. Accordingly, the capital gains and interest income derived by Gilmore through the sale of the Gilmore Industrial Center are outside of Oregon's taxing jurisdiction (and the court has found no evidence to cause it to change its conclusion because of the stipulated fact that the sale of the property was to the plaintiff's Pension Trust).

*Taxability by Oregon of Interest Received Through Plaintiff's Temporary Investment of Proceeds of Common Stock Sale.* Late in 1972, Gilmore sold to Midland Ross

Corporation $8,000,000 of Gilmore Steel Corporation common stock as part of an overall transaction with Midland Ross, involving the building of the Rivergate Mill. Under the agreement, $1,000,000 of the $8,000,000 could be used by Gilmore to carry its inventory and $7,000,000 was required to be used to build the Rivergate plant. Although Gilmore had been in existence since 1928, this is the only sale of its common stock to an "outsider" in its total history. Because there was a time lag before the Rivergate Mill could be built, plaintiff had the opportunity to earn interest income on the stock sale funds and it invested $4,000,000 of the funds at the end of 1973 in accordance with guidelines established by its board of directors. The company earned approximately $172,446 of interest from these funds in 1973 and $108,687 in 1974. This interest income was reported as nonbusiness income for California tax purposes.

The *ASARCO* case, *supra,* makes clear that a non-domiciliary state may tax interest income of a unitary business. The parties have stipulated (Stip, at 8-9):

"36. The sale of $8,000,000 in Gilmore Steel common stock to Midland Ross *was part of an overall transaction* with Midland Ross involving the building of the Rivergate Mill.

"37. One million dollars of the $8,000,000 from the sale *was required to be used* by Gilmore Steel to carry its inventory and $7,000,000 *was required* to be used to build the Rivergate plant." (Emphasis supplied.)

By virtue of the stipulation, the court is impressed that the transaction described was so closely related to Gilmore's principal activity of producing and selling steel products that this financial transaction must be regarded as a concrete step in pursuing its unitary business. Accordingly, the State of Oregon is entitled to tax its apportioned share of the interest income received from the investment of $4,000,000 during the tax years 1973 and 1974.

*Profit on the Sale of Option to Repurchase Portland Property.* In 1966, Gilmore Steel owned but was not using (had never used "and could not use") a portion of its property near its Front Avenue plant in Portland "because this property was below the high water line" (Stip, at 10). The Port of Portland desired this land to dump spoils from dredging operations and,

in 1966, Gilmore conveyed the property to the Port, under an arrangement where the Port had the right to fill the property but Gilmore had an option to repurchase it. Gilmore retained the right to run lines across the property but did not use the easement. At no time did Gilmore have plans to develop this property. The option ran for six years, until 1972, before which date Gilmore intended to move its plant to the Rivergate location. In 1972, Gilmore gave the option to its Pension Trust in lieu of cash, a transaction treated as a sale for tax purposes, and reported the gain in its California return as a sale producing nonbusiness income. "Gilmore Steel is not in the business of acquiring and disposing of options to acquire real property." (Stip, at 11.) The gain from the disposal of the property option was realized in 1972 (and the department's taxation thereof reduced plaintiff's net operating loss in Oregon in 1973).

Once again it is necessary to construe UDITPA'S definitions of "business income" and "nonbusiness income" in ORS 314.610(1) and (5) and the applicable regulation (as published in connection with the ORS 1971 Replacement Part), OAR 150-314.610(1)-(B). The statute states:

"(1) 'Business income' means income arising from transactions and activity *in the regular course of the taxpayer's trade or business* and includes income from tangible and intangible property if the acquisition, the management, use or rental, and the disposition of the property *constitute integral parts of the taxpayer's regular trade or business operations.*" (Emphasis supplied.)

In Oregon, Gilmore's "regular trade or business operations" (in the years in issue) were the production and sale of steel.

With respect to the gain on the "sale" of the option, the plaintiff places heavy reliance upon the department's own regulation, OAR 150-314.610(1)-(B), example (1)(v):

"The taxpayer, who operates a multistate chain of grocery stores, purchases as an investment an office building in another state with surplus funds and leases the entire building to others. The net rental income is nonbusiness income."

The defendant states that the department's position

is "that all of the income in question arose in the usual course of plaintiff's unitary business operation and was subject to apportionment in all states where it is conducting its unitary business." (Def Trial Br, at 5.) In support of this application of its position under the present set of facts, it cites three cases.

The first case is *Johns-Manville Corp. v. Commissioner of Rev. Adm.,* 115 NH 428, 343 A2d 221 (1975). In that case, a Delaware corporation, with places of business in New Hampshire, Mississippi and 14 other states, purchased timberland in Mississippi and used it for supplying needs of its unitary business until 1965. At that time, because the corporation changed the chemical formula of a product, it no longer used timber from the property. The court found, nevertheless, that it continued to hold the land as an "investment," adding more acreage thereto between the years 1946 and 1970. It sold the land in December 1971 at a substantial gain and Mississippi taxed all of that gain. The New Hampshire court found that nonharvesting of timber from 1965 to 1971 did not affect the conclusion that the land was held for the business purpose of producing profits. The court held that investment income was includable in the unitary business "where the investment was held as a means of furthering the unitary business, was carried on the books as an asset, was purchased with income produced by the unitary business, the same officers controlled the business and the investment, and where the income and every gain was commingled with other income and used in the business."

Plaintiff distinguishes *Johns-Manville:*

"* * * In *Johns-Manville,* however, the taxpayer acquired the property in question in 1946 for a business purpose: to provide timber to be used in the production of insulating board at a Mississippi plant. The land was used continuously as a source of supply for 19 years, until 1965. In 1966, the taxpayer discontinued its fiberboard production, but continued to hold the timberland as investment. The New Hampshire Supreme Court held that the gain on its sale was apportionable business income. Here, by comparison, Gilmore Steel acquired the option as an investment and neither the option nor the underlying realty was ever intended to be used in Gilmore Steel's business. Furthermore, it should be noted that the New Hampshire Supreme Court's opinion

does not involve an interpretation of UDIPTA [sic]." (Pl Reply Br, at 7-8.)

If this court had been exposed fully to the testimony in the *Johns-Manville* case, it might have reached the same decision as the New Hampshire court. But with *ASARCO, supra,* in mind, it is not able to do so in this suit.

Defendant's second citation is to *W. R. Grace Co. v. Comm. of Rev.,* 393 NE2d 330 (Mass, 1979). In that case, the plaintiff was a Connecticut corporation doing business in Massachusetts. Plaintiff owned many subsidiary corporations. It sold its majority stock interests in Miller Brewing Co., a Wisconsin corporation, and other companies in 1969, realizing significant gains. The question presented was whether this gain was properly subject to apportionment under the Massachusetts corporation excise tax law, GL c 63, § 38, as "derived from business carried on within the Commonwealth [of Massachusetts]"? Grace claimed that the income was derived from a passive investment, not "business." However, the Supreme Judicial Court found that Grace, having a majority of the stock in Miller, was, in fact, operating a subsidiary, the buying and selling of which was just one of its many purchases and sales of operating subsidiaries. In its conclusion, the court stated that Grace acknowledged that all of its operating businesses in the United States, including its Massachusetts activities, were "unitary" for the purpose of state taxation—and Grace did not prove that Miller was different. 393 NE2d, at 335.

The facts in the *Grace* case are substantially different from the facts in the present case, in that the Massachusetts record was replete with evidence that Grace's chief business was the buying, operating and selling of subsidiary corporations. The preponderance of the testimony in the present case leads the court to the view that Gilmore was not in the business of buying or selling either options or real estate.

Defendant's third citation is to *Qualls v. Montgomery Ward and Co.,* 226 Ark 207, 585 SW2d 18 (1979). Montgomery Ward is an Illinois corporation with its headquarters in that state but it was doing business in many other states. During the years in question, it was doing business in Arkansas through retail stores, catalog stores and catalog agency stores.

It derived income from interest on loans made by it to its subsidiaries, affiliates, parent and related corporations. It did not apportion any of this interest income to Arkansas, deeming it "nonbusiness" and allocable to the headquarters state of Illinois. Arkansas has adapted the UDITPA statute. The pertinent Arkansas regulation provided that interest income is business income when the intangible with respect to which the interest was received arises out of or was created in the regular course of the taxpayer's trade or business operations or where the purpose for acquiring and holding the intangible is related or incidental to such trade or business operations. Where such a close relationship is found, it requires apportionment of interest on federal income tax refunds, on a judgment against a debtor, on a special account to maintain workman's compensation, on a temporary investment of funds to be used to pay taxes for the unitary business, on interest from funds held pending redemption of money orders and travelers' checks issued by the taxpayer, on interest on working capital, on interest on "extra cash" invested in securities pending utilization in the working capital, and on interest from the investment of the proceeds of the sale of the subsidiary. (The Arkansas court referred to the distinction made in *Sperry and Hutchinson Co. v. Department of Rev.*, 270 Or 329, 527 P2d 729 (1974), recognizing the possibility of apportionment of funds used for *short-term investments* (585 SW2d, at 26).) The court found that, under the facts established in *Qualls,* there was no activity in Arkansas in relation to the loans and advances from which the interest in question was derived. "The funds for the loans and advances came from cash available after projection of Ward's own cash needs." 585 SW2d, at 24. Nevertheless, the Arkansas court decided that the income was apportionable because the regular and consistent pattern of the loans constituted a regular course of business. This, too, was before *ASARCO.* The line between "unitary" and "discrete" activities may be very narrow. This court finds that *Qualls* is distinguishable from the facts in the Gilmore option transaction, particularly with reference to the number of loans made by Montgomery Ward, in contrast to the sole option sale by Gilmore. But the court, seeking to follow *ASARCO,* but not having the transcript of the *Qualls* trial, is unable to determine whether Montgomery Ward's lending activities would be discrete or a part of the unitary business within the rule of *ASARCO.*

■    After study of the stipulations and arguments in the present suit, the court *infers* that in Gilmore the land was purchased as a part of the plaintiff's original Oregon steel mill site, but that, from the first, it deemed and treated that unusable land as wasteland, acquired of necessity to obtain the desired working site. It was unusable but the possibility of its upgrading by filling was apparent. The wasteland was sold to the Port of Portland with expectation of its improvement by filling to grade with dredging spoils. The plaintiff, therefore, took an option to repurchase as a long-term corporate investment. The gain on the sale of the option was not obtained through a transaction in the regular course of the plaintiff's unitary business of producing and selling steel. It was "nonbusiness" in Oregon. It should not be included in either numerator or denominator of Oregon's income tax apportionment formula.

*Canadian Sales of Goods Originating in Oregon, 1974-1976.* Following the efforts in Canada of its salesman, Mullarkey, in 1974, Gilmore sold to Inter-Provincial Pipe Mill Company (IPPM) steel plate which IPPM planned to use in manufacturing pipe for use in the Alaska Pipe Line. This 56,000 ton order was the largest in Gilmore's history. For the tax year 1975, Gilmore excluded from its sales factor all of its foreign sales, including $18,508,210 attributable to Canada. Only the Canadian sales are in issue in this court.

The record is not clear but it is assumed that most if not all of this sum was paid by IPPM. Mullarkey was based in the State of Washington. It has been stipulated that *his* activities in Canada came within the exemption from taxation of a 1959 federal statute, Public Law 86-272, § 101 (codified as 15 USC § 381), if Canada were subject to that statute. This statute prohibits the income taxation of a "person" engaged in interstate commerce in State A when the person is domiciled in State B and its only activity in State A is sales solicitation (the order executed in A being approved in and shipped from B).

Following the sale to IPPM, a number of difficult technical problems arose in connection with IPPM's efforts to convert the Gilmore steel plate into steel pipe which would meet the requirements imposed by Bechtel Corporation and

Alyeska Corporation. (Welding problems arose along with surface, edge and camber problems.) The last portion of the order was cancelled by IPPM in 1976. Working out the cancellation fee and the offsets claimed by the purchaser involved extensive discussions (after the sale).

Bill Link, Production Supervisor at Gilmore, visited IPPM on two occasions (October 1974 and December 1977). On his first trip, he took Harry Leffler, a consultant for Gilmore who had experience in the manufacture of pipe. This visit is deemed by the court to be a part of the sales effort. On his second trip, in 1977, Link was accompanied by Mr. McSweeney, Gilmore's vice president in charge of sales. (Mr. McSweeney also visited IPPM in 1976.) These visitors sought to settle contractual disputes concerning the order. They advised and worked out technical and operational aspects of the transaction. This method of handling customer orders was not typical of Gilmore's business. Usually, once Gilmore had shipped the steel, its involvement in the order was finished. (Stip, at 11-15.)

The Department of Revenue has taken the position that the Canadian sales in 1975 should have been included as a part of Gilmore's Oregon sales because the sales originated in this state and were not taxed in Canada and hence should be "thrown back" to Oregon under UDITPA.

The "throw back" rule is found in ORS 314.665, relating to determination of the "sales factor," as follows:

"(2)   Sales of tangible personal property are in this state if:

"* * * * *

"(b)   The property is shipped from an office, store, warehouse, factory, or other place of storage in this state and (A) the purchaser is the United States Government or (B) *the taxpayer is not taxable in the state of the purchaser."* (Emphasis supplied.)

UDITPA seeks to apply the principle that income derived from taxable activity in interstate commerce should be fully taxed and the tax apportioned among the several jurisdictions, while avoiding double taxation upon the same activity by uniformity in the interpretation of UDITPA by the

competing states. In the typical application of UDITPA, if the situs of a taxable event occurs in a state which does not impose a tax upon or measured by net income, the tax is "thrown back" from the nontaxing state or country to the state from which the property is shipped. Intangible income may be taxed at the business headquarters or domicile of the corporation. The argument has been made that, without these provisions, out-of-state businesses which make "nowhere sales" into another state derive an economic advantage over local intrastate sellers. *See* 29 Vanderbilt L Rev, No 2, 432, n 16 (March 1976).

A foreign country or political subdivision thereof is treated as a "state" for purposes of UDITPA. ORS 314.610(8). The court finds that the substantial amount of time spent by Mr. Mullarkey in Canada in 1974 constituted "solicitation" within the scope of Public Law 86-272. The record is clear that this particular sale was beset by troubles (as described in the stipulation and in Plaintiff's Trial Brief). The problem (as presented by counsel) is what occurred and when it occurred in Canada which would vitiate the plaintiff's alleged tax protection under Public Law 86-272 (holding in mind that all such activity was subsequent to the year 1975 in which the questioned income was received by the plaintiff.)

In Plaintiff's Trial Brief, at 23-24, plaintiff makes the following argument:

"The sales in this case were made to a Canadian buyer and the steel was delivered in Canada. Therefore, the sales would normally be treated as Canadian sales. UDIPTA [sic] provides, however, that if the seller is not taxable in the state to which the goods are delivered, the sales are 'thrown back' and treated as sales of the jurisdiction from which shipment is made. O.R.S. 314.620(2) treats a taxpayer as taxable in another state if 'that state has jurisdiction to subject the taxpayer to a net income tax regardless of whether, in fact, the state does or does not [impose such a tax].' A foreign country or political subdivision is included in the definition of 'state.' O.R.S. 314.610(8). In applying O.R.S. 314.620(2), the determination of whether the 'state' has jurisdiction to subject the taxpayer to a net income tax is made as though the jurisdictional standards applicable to a state of the United States applied in the foreign country. Such jurisdictional standards are supplied by the Constitution of the United States and by

*P.L. 86-272.*

■ "Without the enactment of P.L. 86-272, there would be no doubt that Gilmore Steel, having payroll, sales and occasional property in Canada, would be subject to tax there. [Citation omitted.] P.L. 86-272, however, denies state jurisdiction to tax where the only activities of the taxpayer within that state are the solicitation of orders." (Emphasis supplied.)

Defendant argues:

"* * * In the case before us the activities which the taxpayer contends would give Canada jurisdiction to tax would consist of a solitary visit in 1974, no visits of personnel in the taxable year when the sale took place, to-wit 1975 and a follow up in the year 1976 which is not a matter before the court. It is submitted that based on the facts submitted, the taxpayer has not sustained its burden or proof to show that Canada would have jurisdiction to tax the sales if it had the same law as Oregon does." (Def Trial Br, at 7.)

The court has found no evidence in the record to support plaintiff's allegation that Gilmore had payroll and property in Canada in 1974 or 1975, although a change could be inferred for 1976 and 1977.

There is authority that when a seller enters a foreign state with technical experts to remedy a buyer's problems in using the purchased goods, PL 86-272 no longer applies because the activities of the seller exceed the definition of "solicitation." *Chattanooga Glass Co. v. Strickland,* 244 Ga 603, 261 SE2d 599 (1979); *Miles Laboratories v. Dept. of Rev.,* 6 OTR 82 (1975), *aff'd* 274 Or 395, 546 P2d 1081 (1976).

"Solicitation" is limited to those generally accepted or customary acts in the industry which lead to the placing of orders, not those which may follow as a natural consequence of the transaction, such as collections, servicing complaints, technical assistance and training of buyer's employees. "Presale activities are distinguishable from similar activities that constitute services after the sale." *Olympia Brewing Co. v. Dept. of Rev.,* 5 OTR 99, 110 (1972), *aff'd* 266 Or 309, 511 P2d 837 (1973), *cert denied,* 415 US 976, 94 S Ct 1561, 39 L Ed2d 872 (1974); *Miles Laboratories, supra,* at 95.

The court concludes that in this suit, "solicitation"

by the plaintiff (under PL 86-272) was its only activity in Canada during the tax years 1974 and 1975. The income here in dispute was received by plaintiff on account of Oregon sales only in 1975. The "beyond solicitation" activities in 1977 (and possibly 1976) are not relevant in this case. There is no provision in the statutes or case law for a "relation back" doctrine. Each income tax year "stands on its own feet" or time period.[1] Accordingly, the plaintiff would be protected in Canada from taxation of income attributable to its Canadian income in 1975 if Canada were subject to a law such as PL 86-272. However (although not stipulated), it is implicit in the parties' arguments that plaintiff was not subjected to and did not pay any of the taxes described in ORS 314.610(1) on its sales of steel to Canada or a province thereof in 1975. OAR 150-314.620-(B) (a rule promulgated in connection with the pertinent UDITPA statute found in the 1971 Replacement Part of ORS chapter 314) provides:

> "(1)   A taxpayer is 'subject to' one of the taxes specified in ORS 314.620(1) only if it carries on business activities in another state [or foreign country] *and is required to and pays a tax* based on its business activities in another state [or foreign country]. * * *." (Emphasis supplied.)

This rule is restated in connection with the 1981 edition of ORS chapter 314. The tax administrator's long-continued interpretation of the statute must be given weight by the court *faute de mieux. Keyes v. Chambers et al.,* 209 Or 640, 661, 307 P2d 498 (1957). It appears to the court that this interpretation is required in order to implement ORS 314.665(2)(b)(B), which, for purposes of the sales factor, provides that "(2) Sales of tangible personal property are in this state [Oregon] if: * * * (b) * * * (B) the taxpayer [Gilmore] is not taxable in the state [Canada] of the purchaser."

The court finds that PL 86-272 would have protected the plaintiff from Canadian tax (if PL 86-272 had any force

---

[1] The court recognizes that, under income tax law, what occurs in one year may affect another year, in a number of situations, *but only as the statute provides.* No statute has been found which would affect the court's conclusion as to the irrelevance of post-1975 tax years.

and effect in Canada)[2] because plaintiff engaged only in solicitation of sales in Canada in 1975, the year in which the disputed income was paid to plaintiff for goods sold out of Oregon. However, since Canada actually imposed no tax on

---

[2] Both parties have relied on 15 USC §§ 381-384 (Act of September 14, 1959, Public Law No. 86-272), popularly cited as "PL 86-272." The portion of that statute pertinent to this case reads as follows:

"§ 381. (a) No State, * * *, shall have power to impose, * * *, a net income tax on the income derived within such State by any person *from interstate commerce* if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:

"(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and * * *." (Emphasis supplied.)

This act was a stopgap measure, hastily enacted, under great pressure. (Hartman, *"Solicitation" and "Delivery" Under Public Law 86-272, an Uncharted Course,* 29 Vanderbilt L Rev, No 2, 359 (March 1976), quoting another author who described the statute as "a piece of hasty, hysteria legislation * * * pressured through * * * Congress by a highly organized and certainly skillfully handled group of trade organizations.") It was intended for use during an interim in which a Congressional committee, the Special Subcommittee on State Taxation of Interstate Commerce, would make a definitive study and offer proposed legislation to be enacted into law. The committee made and published a study, over a period of four years, but to this day, almost 20 years later, no definitive action has taken place.

The US Constitution, art I, § 8, cl 2, gives to Congress the power

"To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;"

The Constitution sets up separate classifications for interstate commerce and for foreign commerce. "Interstate commerce" does not include "foreign commerce" unless Congress, by definition, for purposes of a particular statute, includes them both in a single expression. *Border Pipe Line Co. v. Federal Power Commission,* 171 F2d 149, 150, 152 (DC Cir 1948). "Foreign commerce" is regularly defined as commerce and trade between the United States and foreign countries. *Bush v. State Tax Commission,* 65 Wash2d 895, 400 P2d 315, 318 (1965). Only "interstate commerce" is mentioned in PL 86-272.

This court suggests that PL 86-272 can be applied only to interstate commerce and has nothing to do with foreign commerce.

Eliminating consideration of PL 86-272 and the problems of "solicitation," the issue of Canadian income is resolved in favor of the defendant by UDITPA provisions, plaintiff having paid no tax to Canada. ORS 314.610(8) and 314.665(2)(b); OAR 150-314.620-(B).

It is not surprising that Congress omitted foreign commerce from PL 86-272. This is a tax measure. For centuries, nations have raised barriers of indifference to the tax laws of another sovereignty. As England's Mansfield, C.J., said: "For no country ever takes notice of the revenue laws of another." *Boucher v. Lawson,* 95 Eng Rep 53 (KB 1734). Even the states of the United States followed this rule before the passage of reciprocity statutes such as ORS 305.610. In the fourth issue of the present case, PL 86-272 arguments appear irrelevant.

these Oregon sales, the amount involved must be placed in the Oregon sales numerator pursuant to ORS 314.665(2)(b)(B) and tax paid on the apportioned business income. ORS 314.650 and ORS 317.070(1).

Plaintiff shall prepare a form of decree, pursuant to Tax Court Rules 67 and 68, modifying the defendant's Order No. I 80-58 to conform to the court's opinion with respect to the industrial park and the sale of the option. Plaintiff is allowed its statutory costs and disbursements.