COMMISSIONER OF REVENUE *vs.* HOUGHTON MIFFLIN
COMPANY.

Suffolk.   December 4, 1985. — February 3, 1986.

Present: WILKINS, LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Taxation,* Sales and use tax: exemption. *Appellate Tax Board,* Findings.
   *Words,* "Personal service transactions."

The Appellate Tax Board did not err in concluding that the purchase by a
   book publisher of art and cartographic work to illustrate books was a
   "personal service transaction" exempt from sales tax under G. L. c. 64H,
   § 1 (13) (*c*). [670-671]

APPEAL from a decision of the Appellate Tax Board.

*Stephen S. Ostrach,* Assistant Attorney General, for the
Commissioner of Revenue.

*Harold Hestnes* (*Michael Kendall* with him) for the taxpayer.

NOLAN, J. This appeal from the Appellate Tax Board (board)
arises from the refusal of the Commissioner of Revenue (com-
missioner) to abate sales and use taxes assessed against the
Houghton Mifflin Company (taxpayer) for each month from
January, 1975, through December, 1977. The board ordered
the abatement. The commissioner appealed. We affirm the
decision of the board.

From the board's findings of fact and report we learn that
the taxpayer is a business corporation engaged in publishing
trade and educational books, with its principal place of business
in Boston. Each month starting in January, 1975, and continu-
ing through December, 1977, it filed a monthly sales and use
tax return with the commissioner.

After examining the taxpayer's purchase invoices, including
those for art work, the commissioner sent the taxpayer a notice
of intention to assess additional taxes for each of the years
1975, 1976, and 1977. The taxpayer paid an additional assess-

ment and seasonably applied for abatement of so much of this assessment as was attributable to art work. The commissioner denied the applications, and the taxpayer appealed to the board.

An understanding of the process by which art work is generated and purchased by the taxpayer is essential to a resolution of the sole issue in this case, i.e., whether art work purchased by the taxpayer is tangible personal property subject to the sales tax or whether the art work is within the exclusion (from taxable retail sales) of "professional . . . or personal service transactions which involve no sale or which involve sales as inconsequential elements for which no separate charges are made." G. L. c. 64H, § 1 (13) (*c*) (1984 ed.). The board's findings as to the taxpayer's business and its commerce with artists and cartographers were based on the testimony of the art services manager of the taxpayer. She was the only witness.

Almost all the school and college textbooks produced by the taxpayer contain art, and some of them are heavily illustrated. The art is not to decorate, but to expand and illustrate the text. The art was described as "part of the message communicated by the final work." The author of the text generally does not produce the art work. The book editor and the art editor decide what art work is required, in consultation with the author. The taxpayer cannot support a staff of the size and variety of artists needed for its books, and, therefore, it negotiates contracts with free-lance artists to produce the art.[1] The choice of the artist is made by the art editor, often in consultation with the designer of the book.

"Thumbnail sketches" of each book page is the first step in the planning of art work, showing for each page the number and position of text lines and the location and area of illustrations. The art editor then prepares an art specification form

---

[1] In the taxpayer's art department is an employee whose job is to search for new art talent. A variety of resources is used in this search, including artists' agents in the United States and in Europe, and artist credits from competing books and from greeting cards. The witness estimated that during the period 1975 through 1977 the taxpayer could call upon the services of from 400 to 500 artists to work on its books.

which outlines the kinds of illustrations wanted for a story or book and includes several pages of guidelines regarding the page dimensions and margins, requirements as to boards and paints, and any special instructions as to kinds of sketches or finishes desired.

The next step is the preparation of a page layout which reveals the position of the text to be illustrated and indicates the limits of the space available for illustrations. The artist then submits a free-hand pencil sketch of the illustration drawn to the specifications as to subject and position. On the free-hand sketch the art editor writes any comments including instructions as to colors, and returns it to the artist, who then uses paints to produce a finished piece of art in accordance with the instructions given. Color and tone selections are made by the artist with input from the art editor on the limitations of four-color printing. The art editor may return the finished work for changes. If these result from changes in the specifications, the artist is generally entitled to additional payment. Although the content is specified by the taxpayer, the style is an expression of the talent and creativity of the artist. When the work is finished, it is then sent through the production department to a color separator for preparation of the four pieces of film used to make the printing plates for the four process colors.

The financial negotiations with the artist may begin with a purchase order for a sample finish. If so, the artist may submit an invoice for the sample and be paid separately for it. The contract for the art work itself is embodied in a work-for-hire agreement that incorporates the terms of any previous purchase order. The agreement specifies the fee to be paid on satisfactory completion of the work and contains copyright protection and artist credit provisions. It also provides in part: "The work to be prepared by you shall be considered a work made for hire to the extent permitted by the copyright law of the United States, and all rights of ownership and authorship in the work throughout the world shall vest in Houghton Mifflin Company. . . . Your original work submitted will become the property of Houghton Mifflin Company."

When the work is completed, the artist submits an invoice for the work done under the contract and any additional work requested by the art editor. In this case, there was no showing that any illustrators made separate charges for materials.

The taxpayer also contracts with outside specialists for map work or cartography and for technical diagrams. Cartography is a recognized profession requiring special training. As in the case of free-hand illustration, the maps and diagrams are part of the message of the text and not mere decoration. Because of the work flow and the different types of work required, it is not feasible for the taxpayer to maintain a cartographer on its staff. The taxpayer draws on the services of about eight cartographers.

It falls to the art editor to prepare a map specification form indicating area, projection, source, size, purpose, colors, labels, and other information to be shown on the map. Almost always the maps are tailored to illustrate particular texts. The cartographer then submits a pencil sketch, which the editor returns with comments and further specifications. The cartographer prepares acetate or film overlays for the different colors to be used. The editor may return these with a memorandum of further comments, corrections or clarifications.

Just before production, the art editor prepares a stripping dummy, which combines a page proof of the text with color proofs or photostats of the art work and serves as a guide to preparation of the final color separation films.

Like a free-hand artist, the cartographer works under a purchase order and a work-for-hire agreement and sends the taxpayer an invoice for the work done, without making a separate charge for material.

Although the testimony dealt with educational texts, it appeared that the art work for trade books was done under contract in a similar manner.

The taxpayer contends that the purchases of art work and cartographs from independent contractors are entitled to the benefits of G. L. c. 64H, § 1 (13) (*c*) (1984 ed.), which excludes from the definition of "retail sale" (and therefore from the base of the sales and use taxes), "professional, insurance,

or *personal service transactions which involve no sale or which involve sales as inconsequential elements for which no separate charges are made"* (emphasis supplied).

The board analyzed the character of the transactions and found that the taxpayer's basic purpose in contracting for the purchase of the work of artists and cartographers was to obtain their creative services embodied in the finished product. Insofar as it is a question of fact, the board found that the purchases in question are professional or personal service transactions; that they involve sales as inconsequential elements only, for which no separate charges are made; and that the taxpayer has demonstrated that its transactions qualify for the exclusion provided by G. L. c. 64H, § 1 (13) (*c*).

The commissioner argues that these findings of the board are, at most, mixed determinations of fact and law as to which only some deference is required. *French* v. *Assessors of Boston,* 383 Mass. 481, 482 (1981). He argues further that, to the extent that these findings and conclusions are conclusions of law, the standard of review by us is quite broad. See *W. R. Grace & Co.* v. *Commissioner of Revenue,* 378 Mass. 577, 581 (1979). These findings are findings of fact to which we must defer, barring some error of law, where there is substantial evidence to warrant the findings. G. L. c. 58A, § 13. See *New Boston Garden Corp.* v. *Assessors of Boston,* 383 Mass. 456, 466 (1981).

In an earlier case involving this taxpayer in which we upheld the board's determination of fact that sales of type compositions were *not* personal service transactions, we said: "Whether a particular transaction involving the transfer of property is a personal service transaction depends on the facts. Both parties argue, and we agree, that where the services and the property are inseparable, because of the integrated nature of the transaction, the character of the transaction must be analyzed to ascertain whether the buyer's basic purpose was to acquire the property which was sold to it, or to obtain the services." *Houghton Mifflin Co.* v. *State Tax Comm'n,* 373 Mass. 772, 774 (1977).

The taxpayer argues that obtaining the skilled creative services which are embodied in the finished art product is the "buyer's basic purpose" in contracting for the work. The board found that the taxpayer is essentially buying the artists' and cartographers' imagination, talent and skill.

The commissioner for the first time (he did not argue it before the board) advances a "sole purpose" test. The commissioner points to the word "inconsequential" in the phrase in § 1 (13) (*c*) which excludes from the definition of sales subject to tax "personal service transactions which involve no sale or which involve sales as *inconsequential* elements for which no separate charges are made" (emphasis supplied). He claims that the exemption is available only if the taxpayer's *sole purpose* was purchase of services rather than goods. The commissioner seems to rely on *Coca Cola Bottling Co.* v. *Commissioner of Revenue,* 393 Mass. 726, 729 (1985) where, in an entirely different factual context, we suggested that the sole purpose of Coca Cola's purchase of bottles might have to be for resale in order to bring its purchases under a different exemption from use taxes. Reliance on *Coca Cola* is misplaced because that case involved an entirely different portion of the definition of "sale at retail" and did not hold that a sole purpose test was appropriate even in those different circumstances. In the instant case, the board found that these transactions "involve[d] sales as inconsequential elements only."

We are not persuaded by the cases outside of Massachusetts cited by the commissioner because they were decided under statutes which bear little similarity to ours. In all, we perceive no reversible error in the decision of the board.

*Decision of the Appellate*
*Tax Board affirmed.*